Westlaw.

Not Reported in F.Supp.2d, 2006 WL 741918 (W.D.Mo.)
(Cite as: 2006 WL 741918 (W.D.Mo.))

Page 1

Only the Westlaw citation is currently available.

United States District Court,
W.D. Missouri, Western Division.
Crystal JACOB, Plaintiff,
v.
CITY OF OSCEOLA, MISSOURI Ron Booker,
and Stephen Kenig, Defendants.
No. 05-0323CVWNKL.

March 20, 2006.

Kristi L. Kingston, Lynne J. **Bratcher**, Marie L. Gockel, Wanda C. McKoin, **Bratcher** Gockel & Kingston, L.C., Kansas City, MO, for Plaintiff.

Erin E. Lary, Lathrop & Gage SPRGMO, Kristen Baird Roubal, M. Douglas Harpool, Baird, Lightner, Millsap & Harpool, PC, **Springfield**, MO, for Defendants.

## ORDER

LAUGHREY, J.

*1 Pending before the Court is the City of Osceola's ("Osceola") and Ron Booker's ("Booker") (collectively referred to as "Defendants") Motion for Summary Judgment [Doc. # 49]. Stephen Kenig ("Kenig") does not join in Defendants' Motion; therefore, the Court's Order is inapplicable to Crystal Jacob's ("Jacob") claims against Kenig. For the reasons set forth below, Defendants' Motion is granted.

I. Background

A. Overview

Osceola is a fourth class city with approximately 834 citizens that is situated in St. Clair County. Osceola is governed by a mayor and a Board of Aldermen, which consists of four members and supervises the mayor. Booker was the mayor of Osceola from February 1994 until February 2005, and he was the mayor during the entire relevant time period for this case. Because Osceola did not have a chief of police, Booker was responsible for overseeing the Osceola Police Department. Booker did not have any law enforcement training.

Kenig was a police officer for Osceola. He worked for Osceola on a part-time basis beginning in September 2003, but he became a full-time officer a month later in October. Osceola terminated Kenig's employment on August 17, 2004. Kenig was Osceola's only full-time police officer during the relevant time period and he usually worked the night shift, getting off work at about 3:00 or 4:00 a.m.

Prior to hiring Kenig, Booker obtained a criminal background check on Kenig, which did not reveal any reason not to hire him. Booker also spoke with two of Kenig's former employers: the City of Holden Police Department and Ronald Snodgrass ("Snodgrass"), who was the Sheriff of St. Clair County. The Holden Police Department did not discourage Booker from hiring Kenig.

When Booker contacted Snodgrass about Kenig, Kenig was employed at the St. Clair County's Sheriff's Department and he was applying for the position with Osceola. Snodgrass told Booker that Kenig did not meet the county's standards for becoming a road deputy who patrolled the county alone. Snodgrass told Booker that Kenig would be fine as a city officer because he would be confined to the city limits area, but that he did not believe Kenig could be an officer without boundaries. Booker did not ask Snodgrass about the county's standards for its deputies or why Kenig did not meet those standards, primarily because Snodgrass participated in the decision to hire Kenig in Osceola.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 741918 (W.D.Mo.)
**(Cite as: 2006 WL 741918 (W.D.Mo.))**

Because Osceola did not have a chief of police and because Booker had no law enforcement training, Booker asked Snodgrass to sit in on the interviews for candidates for the Osceola position, even though Snodgrass was affiliated with St. Clair County and not Osceola. Kenig interviewed for the position and Snodgrass participated in the interview and the hiring decision. Snodgrass did not object to hiring Kenig to be an officer in Osceola and he never conveyed any basis for not hiring Kenig to Booker.

Osceola terminated Kenig's employment on August 17, 2004, because he provided alcohol to a minor and for brandishing his weapon during a dispute. Kenig pleaded guilty to providing alcohol to a minor in early 2005.

*2 During the relevant time period, Osceola had an employee manual that prohibited sexual harassment. *See* Def. Ex. 9 [Doc. # 50] at § 6(A). During his deposition, Kenig admitted that during his police training he learned that sexual comments and sexual advances were inappropriate and that they violated citizens' constitutional rights. *See* Def. Ex. 11 [Doc. # 50] at 95:11-25.

B. Kenig's Assault on Crystal Jacob [FN1]

> FN1. For purposes of evaluating Defendants' Motion, the Court will assume that Jacob's allegations are true.

Jacob was home alone at her house in Osceola on July 13, 2004. Between 2:00 p.m. and 5:00 p.m. that afternoon, she called the Osceola Police because she was afraid her estranged husband would return to the home. Kenig responded to the call and stayed about thirty minutes at the home. When he left, he made a statement about Jacob inviting him back for dinner later.

Later that evening, Jacob called the Osceola Police Department around 9:00 p.m., and Kenig responded to the call. Jacob called again because her estranged husband had alleged that Jacob's friends were breaking into their home to steal things. When Kenig arrived, Jacob met him at the front porch. Kenig said he would stay until the situation was resolved. Kenig stayed for approximately two hours and he followed her around the house. Jacob stated that Kenig made her uncomfortable because he was following her too closely and making sexual comments, but she could not remember exactly what his comments were.

Later in the evening, Kenig and Jacob were on her back porch. Kenig discussed his divorce and his girlfriend and he talked about how he liked to be with other women. Kenig asked Jacob to have sex with him and she declined. Jacob did not ask Kenig to leave because she was afraid of being alone. At some point, Kenig reached over and touched Jacob's breast. She ended the conversation and told Kenig to leave. Kenig told Jacob, "Why don't you get into something more comfortable" and Jacob again told him to leave.

Kenig walked toward Jacob's front door and she went to her bedroom to change clothes to get ready for bed. Kenig returned down the hallway and he could see into Jacob's bedroom. Jacob was naked from the waist down and she jumped into her bathroom so Kenig could not see her. Kenig apologized and Jacob again told him to leave. When Jacob came out of the bathroom, she saw that Kenig had unzipped his pants and he was exposing his penis to her. Kenig stated, "I've seen yours and now you've seen mine." Jacob told him to leave and Kenig re-zipped his pants.

Jacob started to leave the bedroom to escort Kenig to the front door. Kenig pulled her back into the room. Kenig reached around Jacob's waist and over her shoulder and put one hand down her pants to fondle her vagina and the other hand under her shirt to fondle her breast. Kenig prevented Jacob from moving her arms as he fondled her.

Jacob pulled away as Kenig was kissing her neck and she asked him what he was doing. Kenig responded, "Well, you said you didn't want to have

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 741918 (W.D.Mo.)
(Cite as: 2006 WL 741918 (W.D.Mo.))

Page 3

sex tonight." Jacob again told Kenig to leave and he did.

*3 Kenig was subsequently fired by Osceola in August 2004, but not because of the incident with Jacob. Jacob did not report Kenig's conduct to Booker or Osceola, although she did tell another officer about what Kenig did after Kenig was terminated.

C. Other Complaints About Kenig

1. Jessica Miller

Jessica Miller ("Miller") alleged that in March 2004, Kenig responded to a call at the city park in Osceola. Miller alleged that, against her will, Kenig unzipped her pants and fondled her vagina. Miller told Kenig to stop and he did. Shortly thereafter, Miller alleged that Kenig responded to a call at her home and he suggested that he come back later to help her change into her pajamas.

a. Miller's Complaint to Sharon Brunson

In a declaration submitted with Plaintiff's Opposition to Defendants' Motion, Miller stated that she told Sharon Brunson ("Brunson") about the park incident with Kenig. Brunson was a member of the Osceola Board of Aldermen at the time. According to Miller, Brunson wrote down the information and told her she would follow up with her about it.

In an initial statement, Miller stated that she reported Kenig's conduct "shortly thereafter." See Miller Declaration [Doc. # 52] dated January 2, 2006, at ¶ 4. Subsequently, Defendants procured their own statement from Miller which stated, "I don't remember when I told [Brunson] about the incident with [Kenig]. It could have been after July 14, 2004." See Defendants' Reply [Doc. # 56] at Ex. A dated January 17, 2006. Jacob obtained another statement from Miller, which stated,

After thinking about it I am certain that it happened in the spring around March 2004 (when Kenig unzipped my pants) and I told [Brunson] within a few weeks after it happened about him unzipping my pants. [Brunson] knew who I was from coming in the store that's why I felt comfortable talking to her.

See Miller's Statement [Doc. # 59-2] dated January 27, 2006.[FN2]

> FN2. Initially, the Court did not allow Jacob to submit Miller's Third Declaration dated January 27, 2006. See Order [Doc. # 60] However, in the interest of considering all of the available evidence, the Court will vacate its Order and consider Miller's Third Declaration. Accordingly, the Court will grant Plaintiff's Motion for Leave to File Jessica Miller's Third Declaration. [Doc. # 59]

Brunson also executed a statement regarding when Miller told her about Kenig. According to Brunson's statement,

[Miller] explained to me that one evening when she had been drinking that [Kenig] had tried to kiss her and unzip her pants. She said that she believed she may have come on to him, and given him the wrong idea.

Id. Regarding the timing, Brunson stated that she did not remember the date of the conversation with Miller. According to her, "It possibly occurred after July 14, 2004. It could have been sometime in the Fall of 2004." Id.

b. Miller's Complaint to Snodgrass

Miller also stated that she told Snodgrass about the incident with Kenig. Miller stated, "I also discussed the situation with [Snodgrass]. [Snodgrass] told me that he would report the information to [Booker]." See See Miller Declaration [Doc. # 52] dated January 2, 2006, at ¶ 5. Regarding her complaint to Snodgrass, Miller stated, "I don't remember exactly what I told [Snodgrass]. All I know is I made comments here and there when he came in the store

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 741918 (W.D.Mo.)
**(Cite as: 2006 WL 741918 (W.D.Mo.))**

about the rude things that [Kenig] said to me."[FN3] *See* Defendants' Reply [Doc. # 56] at Ex. A dated January 17, 2006.

> FN3. At the time, Miller worked in a grocery store in Osceola and Snodgrass would come into the store where she worked. *See* Snodgrass Dep. [Doc. # 52] at 58:6-17.

*\*4* Snodgrass testified about Miller's complaint. Snodgrass could not recall exactly what Miller told him about Kenig. According to his best recollection, she complained that "Kenig had made some type of comment to her, and she just wanted me to know about it." *See* Snodgrass Dep. [Doc. # 52] at 59:18-20. Snodgrass believed the comments were probably inappropriate, although he could not recall exactly what they were. Snodgrass did not testify that Miller complained about Kenig touching her against her will or unzipping her pants at the park. Snodgrass's testimony focused solely on Miller's complaint about Kenig's inappropriate comments.

Snodgrass told Booker about Miller's complaint, but he did not give Booker her name because "she wanted nothing done about it." *Id.* at 63:10. Snodgrass testified that Miller did not want the comments investigated nor did she want her name relayed to Booker. Thus, he did not provide Miller's name to Booker and there is no evidence that Booker followed up on the information Snodgrass gave him.

There is no evidence regarding the timing of Miller's complaint to Snodgrass. In his deposition, Snodgrass simply testified that, "I think it was warm" when he talked to Miller about Kenig. *Id.* at 59:1. Snodgrass testified that Miller provided him with only one complaint regarding Kenig. *Id.* at 58:23.

*2. Tammy Ryan*

In March 2004, Tammy Ryan ("Ryan") called the Osceola Police Department to report child abuse at a neighbor's house and Kenig responded to the call. In response to a question from Ryan, Kenig responded "twelve inches." Later in the conversation, Ryan again tried to ask Kenig a question and he stated, "I think my answer was better." She responded, "What do you mean?" and he stated, "twelve inches, didn't your sister tell you?" *See* Ryan Dep. [Doc. # 52] at 13:23 to 15:23. Ryan interpreted Kenig's response as referring to the size of his penis because Ryan's sister had previously dated Kenig. *Id.*

A few days later, Kenig called Ryan at around 2:00 a.m. He told her that he was getting off work at 3:00 a.m. and he said, "You owe me. You want to come by my house and take care of what you owe me?" *Id.* at 16:16-25. Ryan hung up on Kenig and he called twice more within the next week and said the same thing. Again, Ryan interpreted Kenig's comments as being sexual.

Ryan continued to follow up with telephone calls about the child who was allegedly abused and she eventually contacted the Division of Family Services. In a subsequent telephone conversation, Kenig told her to he was "going to shoot her in the F'ing foot" if she did not stop calling about the child. *Id.* at 20:17 to 21:1.

Ryan contacted Booker and complained about Kenig's comments and his threat. Ryan would have spoken with Booker in March or April 2004 based on the timing set out in her deposition. Booker did not follow up with Ryan about her complaint.

*3. Tara Scott*

*\*5* In June 2004, Tara Scott ("Scott") and her mother, Diana Morgan ("Morgan"), went to Booker's house to complain about Kenig. Earlier, Scott was walking home in the rain and Kenig offered her a ride home. According to Scott, Kenig "insisted" that she get in the car, but she refused. Morgan contacted Booker and told him that Scott was afraid of police officers and men in general because of her experience with men in the past. Morgan asked

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 741918 (W.D.Mo.)
**(Cite as: 2006 WL 741918 (W.D.Mo.))**

Booker to instruct Kenig not to offer Scott a ride or talk to her unless Scott requested it. Booker followed up with Kenig and he stated that he was only offering her a ride because it was raining. There is no evidence that Kenig made any sexual or inappropriate comments to Scott.

### 4. Vicky Raymond

It is unclear when Vicky Raymond ("Raymond") made a complaint about Kenig, but it was prior to his termination in August 2004. Raymond complained to Donna Hudson ("Hudson"), a member of the Osceola Board of Alderman, that Kenig had made an inappropriate comment to her when she was at the hospital. There is no evidence regarding the nature of the comment. Raymond submitted her complaint to Hudson who in turn notified the rest of the Board of Aldermen and Booker during a subsequent meeting. Booker contacted Raymond about her complaint and she denied that she had a complaint or that there was a problem. *See* Booker Dep. [Doc. # 52] at 69:16 to 70:2. Booker did not specifically ask Raymond if Kenig's comment was sexual in nature, but she denied that she had any problem with him. Booker contacted Raymond the day after Hudson notified him of the problem.

### 4. Charlene Sommer

Charlene Sommer ("Sommer") alleged that Kenig tried to kiss her against her will and that he touched her breast while she was getting out of his vehicle. The incident occurred in August 2004. Sommer reported the incident to Booker.

### 5. Sac Osage Hospital Incident

Snodgrass testified that he heard a rumor that Kenig had touched a woman on the buttocks at the Sac Osage Hospital after he followed her into a nurse's station. *See* Snodgrass Dep. [Doc. # 52] at 31:19-24. Snodgrass stated that he did not receive the complaint and that "it came through a second party, and I cannot remember who the second party is. And I believe one of my deputies even also told me about the situation." *Id.* There is no evidence of when this occurred. Snodgrass reported the incident to Booker and Booker stated that he already had the information. *Id.* at 62:19 to 63:7.

### 6. Housing Incident

Snodgrass also testified that he heard about a complaint from an individual who lived in a housing unit in Osceola and an officer had allegedly touched her breast. *Id.* at 32:14-17. There is no name provided for the complainant nor is there any evidence about when this occurred. In fact, Snodgrass was not even sure that Kenig was the officer who allegedly committed the misconduct. *Id.* at 67-68. Snodgrass again classified this as a "rumor."

### 7. Theresa Temkey

*6 Theresa Temkey ("Temkey") had contact with Kenig in June 2004. Kenig allegedly exposed his penis to Temkey and slid his nightstick up her nightgown. Temkey did not tell anyone about the incident with Kenig until May 2005.

### D. Jacob's Complaint

In April 2005, Jacob filed a two-count Complaint against Defendants and Kenig. *See* Complaint [Doc. # 1]. The first count was filed under 42 U.S.C. § 1983 and alleged that Kenig violated Jacob's constitutional rights and the other Defendants were liable because they condoned a pattern of misconduct, provided inadequate training, and had inadequate hiring procedures. Jacob sued Booker and Kenig in both their individual and official capacities. *Id.* at ¶ 32. The second count was filed against Kenig only for battery. Defendants moved for summary judgment on Count I of Jacob's Complaint in its entirety.

### II. Discussion

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 741918 (W.D.Mo.)
(Cite as: 2006 WL 741918 (W.D.Mo.))

A. Jacob's Section 1983 Claim Against Osceola for Deliberate Indifference

To subject Osceola to section 1983 liability, Jacob must show that Osceola had a "policy or custom of failing to act upon prior similar complaints of unconstitutional conduct, which caused the constitutional injury at issue." *Rogers v. City of Little Rock,* 152 F.3d 790, 798-99 (8th Cir.1998) (quoting *Andrews v. Fowler,* 98 F.3d 1069, 1075 (8th Cir.1996)). "There must exist a prior pattern of unconstitutional conduct that is so 'persistent and widespread' as to have the effect and force of law." *Andrews,* 98 F.3d at 1075 (quoting *Monell v. Dep't of Social Services of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). A plaintiff must show "that the [defendant] officials had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action." *Id.* The term "official policy" encompasses "a deliberate choice to follow a course of action ... made from among various alternatives' by an official who has the final authority to establish governmental policy." *Jane Doe A v. Spec. Sch. Dist. of St. Louis County,* 901 F.2d 642, 645 (8th Cir.1990) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).

If a plaintiff can demonstrate such a pattern of misconduct, then the plaintiff must demonstrate that the governmental entity's policymaking officials were "deliberately indifferent or [they] tacitly authorized the misconduct after receiving notice of it." *Ware v. Jackson County, Missouri,* 150 F.3d 873, 880 (8th Cir.1998) (quoting *Jane Doe A,* 901 F.2d at 646). To prove deliberate indifference, prior complaints about the purported misconduct must have had merit. *Rogers,* 152 F.3d at 799. Deliberate indifference "is a difficult burden for a plaintiff to meet and becomes the key issue." *Liebe v. Norton,* 157 F.3d 574, 577 (8th Cir.1998) (citations omitted).

Assuming a plaintiff can establish both the existence of a pattern of misconduct and deliberate indifference, the plaintiff must also demonstrate that the "custom was the moving force behind the constitutional violation," *Ware,* 150 F.3d at 880; *i.e.,* that the custom caused the constitutional injury at issue.

*7 Jacob points to several complaints about Kenig that she argues proves that Osceola had notice about Kenig's propensity for sexually assaulting her in July 2004. Regarding the complaints from Sommer and Temkey, it is clear that Osceola did not have notice of those incidents prior to July 2004. The incident involving Sommer occurred in August 2004 and the incident involving Temkey occurred in June 2004, but it is undisputed that Temkey did not report it to anyone until May 2005. Thus, it is clear that Jacob may not rely on either of these incidents to establish that Osceola had notice of Kenig's misconduct at the time she was assaulted.

Regarding the complaints about Kenig's behavior at the Sac Osage Hospital and the Osceola housing complex, there is minimal evidence submitted about those reports. Jacob does not offer the name of the complainants nor is there any evidence that Booker or Osceola had notice about these incidents prior to July 2004 because Jacob has not presented evidence about when those complaints were submitted. Moreover, there is no evidence that the reports were ever substantiated or that they have any merit, which defeats her claim that they provided adequate notice to Osceola. *See Rogers,* 152 F.3d at 799 (prior complaints must have had merit); *Johnson v. Elk Lake Sch. Dist.,* 283 F.3d 138, 144 n. 1 (8th Cir.2002) (courts are "reluctan[t] to impose on the [governmental entity] an obligation to treat as true, all rumors, until proven otherwise.").

Similarly, Raymond's complaint about Kenig could not have put Osceola on notice because she refused to cooperate when Booker contacted her about it. It is undisputed that immediately after Booker learned of Raymond's complaint, he contacted her to find out what Kenig did and she denied that she had any complaint against Kenig. Because Raymond refused to participate in Booker's investigation, her complaint was not substantiated and it cannot be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 741918 (W.D.Mo.)
(Cite as: 2006 WL 741918 (W.D.Mo.))

the basis for establishing notice against Osceola. *See Rogers,* 152 F.3d at 799 (prior complaints must have had merit).

Regarding the incident where Kenig offered a minor girl a ride home during a rainstorm, Osceola did have notice of the incident because the girl's mother complained to Booker prior to July 2004. However, there is no evidence that Kenig made an inappropriate comment to the girl or that he was sexually aggressive toward her in any way. Thus, the incident is not comparable to Kenig's sexual assault on Jacob and it could not have provided notice to Osceola that he had a propensity for sexually assaulting women. Because the incident is not similar to Kenig's unconstitutional conduct, it cannot establish that Osceola was put on notice about Kenig. *See Baker v. McCoy,* 739 F.2d 381, 384-85 (8th Cir.1984) (to establish notice in section 1983 context, prior incidents of misconduct must be similar to conduct at issue); *Andrews,* 98 F.3d at 1075; *S.J. v. Kansas City Missouri Public Sch. Dist.,* 294 F.3d 1025, 1028-29 (8th Cir.2002) (prior complaint of inappropriate sexual comments insufficient to put school district on notice of volunteer's propensity for molesting children).

*8 Similarly, the incident involving Ryan and Kenig's comments to her do not constitute notice that Kenig was likely to commit sexual assault on Jacob. Ryan's complaint reflected that Kenig made inappropriate sexual comments to her and that he threatened her if she did not stop pursuing her child abuse complaint. While Kenig's conduct was egregious and unprofessional, it was not so similar to the physical sexual assault that he committed against Jacob so as to put Osceola on notice of his tendencies. *See Baker,* 739 F.2d at 384-85; *Andrews,* 98 F.3d at 1075.

The only claim that may have sufficiently put Osceola on notice about Kenig was the complaint submitted by Miller. Although the timing of Miller's complaint is inconclusive, for purposes of evaluating Defendants' Motion, the Court will assume that Brunson and Osceola had sufficient notice of Miller's allegation about Kenig prior to July 14, 2004.

Nonetheless, even assuming Miller's complaint was submitted to Osceola prior to July 2004, it was insufficient to establish notice because it was an isolated incident. The Eighth Circuit has held that isolated incidents are insufficient to establish supervisory liability for a constitutional violation because they do not provide adequate notice of a pattern of misconduct. *See Doe v. Gooden,* 214 F.3d 952 (8th Cir.2000) (two incidents of abuse insufficient to establish pattern and notice to supervisors); *Sanders v. Brewer,* 972 F.2d 920 (8th Cir.1992) (citing *Howard v. Adkison,* 887 F.2d 134 (8th Cir.1989)); *Thelma D. v. Board of Education of City of St. Louis,* 934 F.2d 929 (8th Cir.1991) (five complaints of abuse over sixteen-year period against teacher insufficient to establish pattern of misconduct); *Jane Doe A,* 901 F.2d 645.

Moreover, there is no evidence that Miller's complaint against Kenig was ever substantiated prior to Kenig's assault on Jacob in July 2004. Miller told Snodgrass she did not want her name disclosed and, because he did not have Miller's name, Booker did not follow up on the complaint.

Jacob argues that Booker should have followed up on Snodgrass's statement and requested Miller's name. According to Jacob, Booker could have substantiated Miller's complaint if he had taken appropriate action. The Court acknowledges that Booker should have done a more thorough investigation, but investigatory deficiencies that are the result of mere negligence cannot satisfy the standard of deliberate indifference, *Ervin v. Busby,* 992 F.2d 147, 151 (8th Cir.1993) (citing *Daniels v. Williams,* 474 U.S. 327, 328 (1986)); *Choate v. Lockhart,* 7 F.3d 1370, 1374 (8th Cir.1993); *Andrews,* 98 F.3d at 1077 (citations omitted), particularly where there is no evidence that Booker's faulty investigation was a "facade to cover the violent behavioral patterns of police officers ." *Rogers,* 152 F.3d at 799 (quoting *Beck v. City of Pittsburgh,* 89 F.3d 966, 974 (3rd Cir.1996)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 741918 (W.D.Mo.)
**(Cite as: 2006 WL 741918 (W.D.Mo.))**

After comparing Jacob's claim to opinions from the Eighth Circuit where the governmental entity clearly had more notice than Osceola did, Jacob's claim must fail as a matter of law.

**\*9** For example, in *Rogers,* 152 F.3d 790, an officer who followed the plaintiff to her home and raped her had previously been suspended for wrongfully having intercourse with a fellow cadet at this training academy, but the court held that this was insufficient to put the officer's superiors on notice about his conduct. 152 F.3d 790. In *Rogers,* there were also several sexual harassment claims against the officer, but the claims had not been substantiated; thus, they were held not to have put the officer's superiors on notice as to give rise to a claim for deliberate indifference.

Similarly, in *Andrews,* 98 F.3d 1069, an officer who raped a minor girl had two previous complaints against him for breaking into the home of another minor girl and making sexually suggestive comments to a female driver he had detained. Both of the complaints were substantiated, but the court stated, "These two instances of misconduct indicate that [the officer's superior] was aware that some problem existed with [the officer], but they do not indicate a 'persistent and widespread' pattern of misconduct that amounts to a city custom or policy of overlooking police misconduct." 98 F.3d at 1076 (quoting *Monell,* 436 U.S. at 691).

Jacob cites only *Harris v. City of Pagedale,* 821 F.2d 499 (8th Cir.1987) to support her claim. In *Harris,* the officer pulled over the plaintiff, took her to a cemetery, and then repeatedly raped and sodomized her. *Id.* at 500-01. The plaintiff presented evidence that on at least six prior occasions the officer had arrested women and then either sexually assaulted them or attempted to sexually assault them. When confronted with some of the earlier allegations of assault, the chief of police "acknowledged that he had received other citizen complaints of sexual misconduct by [the officer]." *Id.* at 501. Moreover the mayor testified at trial that she had personally received at least three of the prior complaints. *Id.* at 503. Regarding sexual misconduct by other officers, the mayor and "several city officials testified about personally receiving many other complaints of sexual misconduct by city police officers" and a federal prosecutor also "testified that he had received numerous complaints about civil rights violations by city police officers." *Id.* at 503-04. The prosecutor relayed those concerns to the chief of police. *Id.*

In finding that the plaintiff had established a pattern of unconstitutional conduct, the Eighth Circuit held,

The evidence in this case clearly establishes that there was a pattern of sexual misconduct by city police officers, especially [the officer who raped the plaintiff], that on repeated occasions city officials in positions of authority and responsibility were notified of the offensive acts, but that upon receiving such notice, these city officials repeatedly failed to take any remedial action. We conclude this amounts to deliberate indifference to police abuses.

**\*10** *Id.* at 506. Jacob had not submitted comparable evidence of a widespread pattern of abuse nor has she submitted evidence of repeated instances of notice to Osceola or its officials. *Harris* involved "copious evidence of past misconduct" while Jacob's claim consists of only one comparable complaint submitted by Miller. *Id.* at 504. Thus, *Harris* is distinguishable from the evidence submitted by Jacob

In light of the foregoing precedent in the Eighth Circuit, the Court reluctantly finds that there is insufficient evidence to establish that the pattern of Kenig's unconstitutional conduct was "so persistent and widespread as to have the effect and force of law." *Andrews,* 98 F.3d at 1075. Based on the foregoing, the Court must grant Defendants' Motion on Jacob's section 1983 claim of deliberate indifference.

**B. Jacob's Section 1983 Claim Against Osceola for Inadequate Hiring and Training**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 741918 (W.D.Mo.)
**(Cite as: 2006 WL 741918 (W.D.Mo.))**

Jacob claims that Osceola demonstrated deliberate indifference to her constitutional rights when it failed to adequately screen Kenig before hiring him and it failed to train him. To establish deliberate indifference, Jacob must prove that Osceola "had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *Jennings v. Wentzville R-IV Sch. Dist.,* 397 F.3d 1118, 1122 (8th Cir.2005) (citing *Larson v. Miller,* 76 F.3d 1446, 1454 (8th Cir.1996)). Notice to Osceola may be implied where either (1) "the failure to train is so likely to result in a constitutional violation that the need for training is patently obvious," or (2) "a pattern of misconduct indicates that the [governmental entity]'s responses to a regularly recurring situation are insufficient to protect the [claimant]'s constitutional rights." *Id.* (quoting *P.H. v. Sch. Dist. of Kansas City,* 265 F.3d 653, 660 (2001)). A public entity's hiring or training procedures must have caused the claimant's injury. *See Larson,* 76 F.3d at 1454.

*1. Osceola's Hiring Procedures*

To support this claim, Jacob relies on the fact that Snodgrass told Booker that Kenig was not qualified to serve as a road deputy for the Sheriff's Department. However, it is undisputed that Snodgrass also told Booker that Kenig would be fine as a city police officer and that Snodgrass participated in the hiring decision and he raised no objections about Kenig during that evaluation. Thus, to the limited extent that Snodgrass raised concerns about Kenig, those concerns were mitigated by the fact that he thought Kenig would be a fine city police officer and that he participated in the decision-making process that resulted in Kenig's hiring.

It is also undisputed that Booker procured a criminal background check on Kenig and that he spoke with another former employer of Kenig. Neither of these sources of information gave Booker pause about hiring Kenig. Based on the record before the Court, there is no evidence from which a reasonable jury could infer that Booker was deliberately indifferent to the public's constitutional rights when he hired Kenig.

*2. Osceola's Training Procedures*

**\*11** For purposes of evaluating Defendants' Motion, the Court will assume that Osceola's procedures were inadequate. Thus, the issue before the Court is whether Osceola was put on notice that its training policies were insufficient so as to warrant imposition of liability under section 1983.

The Court has already determined that Osceola was not put on notice of Kenig's unconstitutional conduct. The Court has already found that Miller's complaint did not provide the Defendants with sufficient notice because isolated incidents do not put a public entity on notice that its training procedures are flawed. *Jennings,* 397 F.3d at 1123 ("A single incident, under these circumstances, is insufficient to make a lack of training patently obvious.") (citation omitted); *Wever v. Lincoln County, Nebraska,* 388 F.3d 601, 607 (8th Cir.2004). Thus, there is no basis for finding that there was a "pattern of misconduct" that warranted additional training for Kenig. *Jennings,* 397 F.3d at 1122.

Because Osceola was not put on direct notice, Jacob alternatively may show that "the failure to train is so likely to result in a constitutional violation that the need for training is patently obvious" to demonstrate that Osceola violated her constitutional rights *Id.* Kenig's conduct with respect to Jacob was a clear abrogation of his sworn duty as a law enforcement officer. The Eighth Circuit has held that, where the misconduct at issue is sexual in nature, there is not a "patently obvious" need to train someone not to engage in it. *See Andrews,* 98 F.3d at 1076 ("we cannot conclude that there was a patently obvious need for the city to specifically train officers not to rape young women"); *S.J.,* 294 F.3d at 1029 ("there is, in our view, no 'patently obvious' need to train volunteers not to [molest children] at home and in their private lives").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 741918 (W.D.Mo.)
**(Cite as: 2006 WL 741918 (W.D.Mo.))**

Moreover, there is no evidence that Osceola's deficient training caused Kenig's conduct. Courts hold that "the identified deficiency in a city's training program must be closely related to the ultimate injury" such that "the deficiency in training actually caused" the offending conduct. *Andrews,* 98 F.3d at 1077 (citing *City of Canton v. Harris,* 489 U.S. 378, 391, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). In this case, Kenig stated that he knew that sexual misconduct against a citizen violated the citizen's constitutional rights. *See* Def. Ex. 11 [Doc. # 50] at 95:11-25. Thus, Kenig already knew his conduct was wrong and Osceola's deficient training procedures did not deprive him of that knowledge such that it caused Jacob constitutional harm.

Accordingly, the Court grants Defendants' Motion as it relates to Osceola's inadequate hiring and training policies.

C. Jacob's Section 1983 Claims Against Booker

*1. Official Capacity*

Jacob also sues Booker in his official capacity. "Liability for [government] officials in their official capacities is another form of action against the [governmental entity], and it requires the same showing that a policy or custom caused the alleged violation." *Rogers,* 152 F.3d at 800 (citing *Monell,* 436 U.S. at 690 n. 55; *Marchant v. City of Little Rock,* 741 F.2d 201, 204 (8th Cir.1984)). The Court has already determined that Jacob cannot recover against Osceola. Because the same analysis applies to her claim against Booker in his official capacity, the Court will grant Defendants' Motion on Jacob's claim against Booker in his official capacity.

*2. Individual Capacity*

**\*12** To be individually liable for a section 1983 violation, the government official must (1) receive notice of a pattern of unconstitutional acts committed by subordinates; (2) demonstrate deliberate indifference to or tacit authorization of the offensive acts; (3) fail to take remedial action; and (4) the failure to take remedial action must proximately cause the plaintiff's injury. *Andrews,* 98 F.3d at 1078 (citing *Jane Doe A,* 901 F.2d at 645); *Rogers,* 152 F.3d at 800. Moreover, the official to be held individually liable must have "actual knowledge or connection with the conduct alleged to have violated the plaintiff's constitutional rights." *Marchant,* 741 F.2d at 204.

The Court has already determined that Booker did not have sufficient notice of Kenig's conduct so as to impute section 1983 liability to Osceola. Similarly, the Court finds that Booker did not have sufficient notice so as to impose liability against him in his individual capacity. Even assuming such notice existed, there is no evidence that Booker had "actual knowledge or connection," *Marchant,* 741 F.2d at 204, with Kenig's conduct or that he demonstrated "tacit authorization of the offensive acts." *Andrews,* 98 F.3d at 1078.

III. Conclusion

Accordingly, it is hereby

(1) ORDERED that the Court's previous Order disallowing the submission of Jessica Miller's Third Declaration [Doc. # 60] is VACATED;

(2) ORDERED that Plaintiff's Motion for Leave to File the Third Declaration of Jessica Miller [Doc. # 59] is GRANTED; and

(3) ORDERED that Osceola's and Booker's Motion for Summary Judgment [Doc. # 49] is GRANTED.

W.D.Mo.,2006.
Jacob v. City of Osceola, Mo.
Not Reported in F.Supp.2d, 2006 WL 741918 (W.D.Mo.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.